## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | |
|---|---|
| HAYES LEMMERZ INTERNATIONAL-GEORGIA, INC., | : : : : |
| Plaintiff, | : CIVIL ACTION NO. : 2:09-CV-0021-RWS |
| v. | : : |
| PUNCH PROPERTY INTERNATIONAL NV, | : : : |
| Defendant. | : |

## **ORDER**

This case comes before the Court on Plaintiff's Renewed Motion to Dismiss Defendant's Counterclaims and Amended Conditional Counterclaims [42], Plaintiff's Second Motion for Sanctions [59], and for a determination of sanctions pursuant to the Court's Order [55] granting Plaintiff's Motion for Sanctions [51]. After considering the record, the Court enters the following Order.

## **Background**

Defendant Punch Property International NV ("Defendant" or "Punch International") is a Belgian company that has an American subsidiary, Punch

Property. (Dkt. No. [12], Counterclaims, at ¶ 5). Plaintiff Hayes Lemmerz International-Georgia, Inc. ("Plaintiff" or "HLIG") is a subsidiary of Hayes Lemmerz International, Inc. ("HL International"). (Id. at ¶ 4). Punch International sought to acquire a segment of HL International's automotive wheel business—specifically, a Belgian subsidiary of HL International ("HL Belgium") and an automotive wheel manufacturing plant in Gainesville, Georgia ("Property"). (Id. at ¶¶ 6, 8). Accordingly, parties entered into a "comprehensive agreement [that] was memorialized in two related contracts" on June 13, 2008: (1) a Share Sale and Purchase Agreement ("Share Agreement") to acquire shares in HL Belgium, and (2) an Agreement of Purchase and Sale ("Property Agreement") to acquire the Property from HLIG. (Id. at ¶¶ 6–9).

In connection with the Property Agreement, Punch International made a $1 million earnest-money payment. (Id. at ¶ 17). The Property Agreement stipulates that the transaction shall take place either five days after Plaintiff gives Defendant written notice that business operations at the Property had ceased or on June 30, 2009, whichever is earlier. (Dkt. No. [1-1] at ¶ 4.1). The total purchase price for the Property is $5 million. (Id. at ¶ 1.2). But, the Property Agreement disclaims both that the "seller is making [any]

representations or warranties, whether express or implied, … with respect to the quality, physical condition or value of the property, the income or expenses from or of the property" and "the representations … furnished by any employee, servant or other person … purporting to represent seller, except as and to the extent expressly set forth herein." (Id. at ¶ 7.14). Furthermore, the agreement says that it "embodies and constitutes the entire understanding between the parties hereto with respect to the transactions contemplated herein, and all prior or contemporaneous agreements, understandings, representations and statements, oral or written, are merged into [it]." (Id. at ¶ 7.3)

Defendant emphasizes that it would not have tried to acquire the Property unless it also acquired shares in HL Belgium. (Dkt. No. [12], Counterclaims, at ¶ 10). For example, it points to Paragraph 5.2 of the Share Agreement, which stipulates that "[a]ll actions at Closing shall be performed simultaneously" and that Plaintiff and Defendant would concurrently enter into the Property Agreement, "which shall also be considered a Closing action for purposes of [the Share] Agreement." (Id. at ¶ 11). Furthermore, on October 31, 2008, parties entered into an agreement to amend the terms of both the Share Agreement and Property Agreement. (Id. at ¶ 12).

3

Defendant also says that Plaintiff knew the two transactions were related because "individuals associated with HLIG who negotiated the Property Agreement were also involved in negotiations of the Share Agreement." (Id. at ¶ 13). Indeed, Defendant states that HL International represented to Punch International that HL Belgium "had existing contracts and orders with Ford, Fiat, Volvo and Mercedes for the sale of automotive wheels" that would continue for at least five years. (Id. at ¶ 15). According to Punch International, this representation was an essential basis for the June 13th agreements because both parties "understood that the sales price of the Property was determined by the nature and volume of HL Belgium's business, as represented to Punch International by HL International." (Id. at ¶ 14).

However, within months of executing the Share Agreement and Property Agreement, Ford, Fiat, Volvo, and Mercedes withdrew several of their contracts and orders, which "substantially affected the business of HL Belgium and the value of the Property." (Id. at ¶ 18). Defendant asserts that—while the parties were still negotiating—HL International contacted these car manufacturers and arranged for them to withdraw their contracts from HL Belgium and transfer them to HL International. (Id. at ¶ 19). While HLIG knew about HL

4

International's actions, neither Punch International nor Punch Property knew the same. (Id.). As a result, "[t]he fraudulent representations artificially inflated the value of the Property, and Punch Property would not have agreed to enter into the Property Agreement had it known that the representations regarding the contracts and orders … were false." (Id. at ¶ 21).

Upon discovering that the car manufacturers had withdrawn their contracts, Punch International notified HLIG that it would not close on the Property's sale and that the Property Agreement should be rescinded. (Id. at ¶ 22). On January 23, 2009, however, Plaintiff notified Defendant that it had ceased business at the Property and requested Punch International to comply with the Property Agreement. (Dkt. No. [1] at ¶ 4). Defendant refused. (Id. at ¶ 5). "Punch Property has not affirmed the Property Agreement, and Punch Property has not retained any benefit under the Property Agreement." (Dkt. No. [12], Counterclaims, at ¶ 23).

HLIG sued Punch International on February 9, 2009, for specific performance of the Property Agreement, breach of contract, and attorney's fees. (Dkt. No. [1] at ¶¶ 28–42). Punch International filed counterclaims to rescind the Property Agreement on the basis of the fraudulent misrepresentations

5

alleged. (Dkt. No. [12], Counterclaims, at ¶¶ 24–40). Although Plaintiff filed a Motion to Dismiss Defendant's Counterclaims and Amended Conditional Counterclaims [33] in July 2009, the Court denied the motion without prejudice [37]; after a stay in the case was lifted, Plaintiff filed a Renewed Motion to Dismiss Defendant's Counterclaims and Amended Conditional Counterclaims [42]. On June 3, 2011, the Court granted Plaintiff's Motion for Sanctions [51] and ordered Plaintiff to submit a statement of fees. (Dkt. [55]). Lastly, on June 15, 2011, Plaintiff filed a Second Motion for Sanctions [59].

## Discussion

### I. First Motion for Sanctions

On June 3, 2011, the Court issued an Order [55] granting Plaintiff's Motion for Sanctions [51], awarding Plaintiff the attorney's fees associated with the filing of the Motion. On June 10, 2011, Plaintiff's Counsel submitted a statement of fees. After considering Plaintiff's submissions [58, 62, 63], and Defendant's response [61], the Court **AWARDS** Plaintiff $2,962.50 in attorney's fees.

6

AO 72A
(Rev.8/82)

**II.     Plaintiff's Second Motion for Sanctions [59]**

After considering Plaintiff's arguments, reviewing Defendant's response [64] thereto, and examining Defendant's responses to Plaintiff's interrogatories (Dkt. [59-2], Ex. 1) and responses to Plaintiff's first requests for production of documents (Dkt. [59-2], Ex. 2), the Court finds that Defendant has demonstrated good faith in its responses and substantially complied with the Court's previous Order [55].  Plaintiff's Second Motion for Sanctions [59] is **DENIED**.

**III.    Motion to Dismiss [42]**

   A.     <u>Standard for Motion to Dismiss</u>

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." While this pleading standard does not require "detailed factual allegations," "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." <u>Ashcroft v. Iqbal</u>, 556 U.S. ----, 129 S. Ct. 1937, 1949 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)). In order to withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is

7

plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570). A complaint is plausible on its face when the plaintiff pleads factual content necessary for the court to draw the reasonable inference that the defendant is liable for the conduct alleged. Id.

It is important to note that while the factual allegations set forth in the complaint are to be considered true at the motion to dismiss stage, the same does not apply to legal conclusions set forth in the complaint. Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009) (citing Iqbal, 129 S. Ct. at 1949). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 129 S. Ct. at 1949. The court does not need to "accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555.

B.   Merits of the Motion

In its Memorandum of Law in Support of Its Motion To Dismiss [33-1], Plaintiff argues that the Court should dismiss Defendant's counterclaims because "Defendant cannot maintain counterclaims based on fraud or equitable rescission that are premised upon representations made in conjunction with another contract between other parties." (Dkt. No. [33-1] at 6). Therefore,

8

Plaintiff contends that Punch International lacks a legally cognizable claim because "the contract in this case contains a merger clause providing that the parties' entire agreement is set forth in the writing of this contract, as well as an express disclaimer stating that neither party has relied upon any representations not contained in express terms of the Agreement." (Id. at 8).

In response, Defendant argues that under Georgia law "a party may seek to rescind a contract on the grounds of fraud, even if the contract contains a merger clause." (Dkt. No. [35] at 6). Accordingly, Defendant argues that because it has not affirmed the Property Agreement or retained any benefit under the Property Agreement, the merger clause does not bar its counterclaims. (Id. at 7–8).

The Court holds that the Property Agreement's merger clause does not bar Defendant from bringing its counterclaims. Although merger clauses are enforceable, whether they prevent parties from recovering for fraud depends on the relief sought. Hall v. Coram Healthcare Corp., 157 F.3d 1286, 1289 (11th Cir. 1998). One who was fraudulently induced by misrepresentations into entering a contract has two actions available: (1) affirm the contract and sue for breach or (2) seek to rescind and sue in tort for fraud and deceit. Carpenter v.

9

Curtis, 395 S.E.2d 653, 655 (Ga. Ct. App. 1990) (citing City Dodge, Inc. v. Gardner, 208 S.E.2d 794, 796 (Ga. 1974)). If a party affirms a contract, the merger clause prevails, and the party is relegated to recovery under the contract. Id. But, "[i]f the party rescinded, the merger clause is avoided and will not prevent recovery under a tort theory." Id. (citing Potomac Leasing Co. v. Thrasher, 354 S.E.2d 210, 213 (Ga. Ct. App. 1987)).

HLIG cites several cases to support its argument that the merger clause bars Punch International from rescinding the contract. Kobatake v. E.I. DuPont de Nemours and Co., 162 F.3d 619 (11th Cir. 1998); Weed Wizard Acquisition Corp. v. A.A.B.B., Inc., 201 F. Supp. 2d 1252 (N.D. Ga. 2002); Patray v. Nw. Publ'g, Inc., 931 F. Supp. 865 (S.D. Ga. 1996). However, all of these cases involved facts in which the party seeking to rescind a contract had already affirmed the contract. See Kobatake, 162 F.3d at 627 (holding plaintiffs who had "neither offered to return nor actually returned the money they received in consideration for … releases [from liability]" to have affirmed the contract); Weed Wizard, 201 F. Supp. 2d at 1261 (finding a party to have affirmed a contract because, after acquiring a business and discovering fraud in regard to the safety of the business's products, it "continued to operate the … business by

10

marketing the … product, relocat[ed] the manufacturing facilities … , and cooperat[ed] with the federal government in the recall of one of the … products"); Patray, 931 F. Supp. at 873–74 (holding a party unable to rescind the contract because it was seeking "the value of that which was promised to him … *plus* damages resulting from the fraud arising out of the contract" (emphasis in original) (internal quotation marks omitted)).

Here, Punch International has neither affirmed nor retained any benefit from the Property Agreement. Therefore, the merger clause does not bar its counterclaims for fraud and to rescind the contract. Although HLIG attempts to mitigate the importance of its parent company's misrepresentations about future client orders, Defendant's allegations that the misrepresentations were material and induced it to enter into the Property Agreement are plausible. Plaintiff's Renewed Motion to Dismiss Defendant's Counterclaims and Amended Conditional Counterclaims [42] is **DENIED**.

## Conclusion

For the aforementioned reasons, Plaintiff's Renewed Motion to Dismiss Defendant's Counterclaims and Amended Conditional Counterclaims [42] is

**DENIED**, and Plaintiff's Second Motion for Sanctions [59] is **DENIED**.

Defendant is **ORDERED** to pay Plaintiff $2,962.50 for attorney's fees.

 **SO ORDERED**, this  26th  day of July, 2011.


              _____
              **RICHARD W. STORY**
              United States District Judge

12

AO 72A
(Rev.8/82)