**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

| | | |
|---|---|---|
| HAYES LEMMERZ | ) | |
| INTERNATIONAL-GEORGIA, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION FILE** |
| | ) | **NO.: 2:09-CV-0021RWS** |
| PUNCH PROPERTY | ) | |
| INTERNATIONAL NV | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

Defendant PPI Property Int'l, N.V. ("PPI") submits these proposed findings of facts and conclusions of law in compliance with the Court's Consent Order Regarding Scheduling dated March 1, 2013.

## I.  JURISDICTION

1.      Hayes Lemmerz Int'l-Georgia, Inc. ("HLIG") is a Delaware limited liability company with principal offices in Northville, Michigan.

2.      PPI is a Belgian company with its principal place of business located at Kopeerstraat 1A, 9830 Sint-Martens-Latem, Belgium.

3.      The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

4.     Venue is proper under 28 U.S.C. § 1391(b)(2).

## II.  BACKGROUND

5.     On June 13, 2008 the parties entered into an Agreement of Purchase and Sale (Property Agreement).   The Property Agreement involved the purchase and sale of a 286,000 square foot industrial/manufacturing facility on 1215 Palmour Drive in Gainesville, Georgia (Real Estate) (Property Agreement ¶ 1.1), and the Paint Line Facilities, i.e., "the paint line, the Moco heat treatment installation, the conveyors and the pre-load station that feed[s] the paint line" (Equipment) (*Ibid.*).

6.     The purchase price was $5,000,000 (Property Agreement ¶ 1.2). Defendant paid into escrow a $1,000,000 deposit (Property Agreement ¶ 1.3).

7.     On October 31, 2008 the parties entered into an Agreement to Resolve Actual Working Capital and to Amend Share Purchase and Sale Agreement and Other Related Agreements (Amendment).  The Amendment added to the Property Agreement terms for the purchase and sale of a Striko Furnace (Amendment ¶ 5.1) for $150,000 (Amendment ¶ 5.2). The Striko Furnace became part of the Paint Line Facilities for purposes of the Property Agreement (*Ibid.*).

8.     The Property Agreement is governed by Georgia law. (Property Agreement ¶ 7.5)

9.     The Property Agreement closing was scheduled for January 30, 2009.

10.     The parties did not close on the Property Agreement.

11.     HLIG filed the above-styled case for breach of contract and specific performance.

12.     PPI timely answered and filed counterclaims for fraud and rescission.

13.     On October 12, 2012 this Court granted HLIG's motion for summary judgment on all claims and counterclaims (Order [Dkt. 129]). The Court dismissed PPI's counterclaims because the fraud allegations did not "relate directly to the Property Agreement" (Order p 3). The Court also granted summary judgment to HLIG on its breach of contract claim (Order p 10).

### III.  DAMAGES

14.     "Where a party sues for damages, he has the burden of proof of showing the amount of loss in a manner in which the jury or the trial judge in nonjury cases can calculate the amount of the loss with a reasonable degree of certainty." *Big Builder v. Evans*, 126 Ga. App. 457, 458 (1972)

15.     "Damages recoverable for a breach of contract are such as arise naturally and according to the usual course of things from such breach and such as the parties contemplated, when the contract was made, as the probable result of its breach." O.C.G.A. § 13-6-2. The Court will not award damages where the breach

of a contract does not cause a loss. *See Norton v. Budget Rent a Car Sys.*, 307 Ga. App. 501, 503 (2010) (claim for breach of contract dismissed where no damages resulted from the breach).

16.    The Court finds the Property Agreement involved the purchase and sale of the Real Estate and the Equipment for $5,150,000.

17.    On May 28, 2013 this Court conducted a hearing to determine what, if any, damages should be awarded. The Court has identified six issues underlying the matter: (A) Earnest Money Payment, (B) the value of the Real Estate, (C) the value of the Equipment, (D) Operating Expense, (E) Attorney's Fees, and (F) Interest.

## A.  Earnest Money Payment

18.    PPI paid into escrow a $1,000,000 deposit. HLIG received these funds.

## B.  Real Estate

19.    HLIG had possession of the Real Estate from the date of the scheduled closing, January 30, 2009, through the date of the sale of the same to a third party buyer on June 4, 2012. The sales price was $1,850,000.

20.    The ordinary measure of damages in a real estate sales contract case "is the difference between the contract price and the market value of the property at

the time of the buyer's breach." *Liberty Life Ins. Co. v. Thomas B. Hartley Constr. Co.*, 258 Ga. 808, 809 (Ga. 1989). "Market value at the time of the breach would be subject to the varying opinions of experts, who would have to reconstruct a past market when making their evaluation." *Liberty Life*, 258 Ga. at 809 (Ga. 1989).

21.    The Court finds the time of the breach to be January 30, 2009.

22.    HLIG presented evidence that it incurred a broker fee of $92,500 for the June 4, 2012 sale of the Real Estate. It also presented evidence that it paid closing costs of $1,850 for this sale. It also presented evidence of incurred attorney's fees and legal expenses of $105,302.37 arising out of the aborted closing under the Property Agreement, a subsequent contract for a sale of the Real Estate in July 2011 that also did not close, and the June 4, 2012 sale.  Evidence was presented that HLIG gained $15,500 from the sale of a propane tank and received $80,000 forfeited earnest money from the July 2011 sale that did not close.

23.    In *Roba v. Dotson*, 315 Ga. App. 721 (2012), a buyer breach a real estate sales contract by failing to close. The trial court awarded the seller damages for the subsequent decrease in the value of the real estate as well as operating losses including real estate taxes paid and maintenance and other costs. On appeal, the court reversed. "[A]s to breach of a contract to sell real property, a special damage rule applies which provides that 'the measure of damages for breach of a

contract to sell land is the difference between the contract price and the fair market value of the land at the time of the breach.' " *Roba*, 315 Ga. App. at 722 (citing *Quigley v. Jones*, 255 Ga. 33 (334 SE2d 664) (1985)). "Moreover, under the special rule for breach of a contract to sell land, there can be no recovery of additional damages of the type recoverable under OCGA §§ 13-6-2 and 13-6-8 'in the absence of a clause in the parties' contract expressly authorizing such recovery.' " *Id.* (citing *Quigley*, 255 Ga. at 34). The Court held general language in the sales contract that the seller in the event of the buyer's breach may "recover additional damages under this contract" or "for any available remedy at law or in equity" did not expressly authorize recovery of the taxes and operating expenses after the breach. *Id.*

24.    The Property Agreement states that HLIG "shall have the right to pursue any and all rights or remedies available at law or in equity, including the right to file suit for specific performance." (Property Agreement ¶ 6.2)

25.    The Court concludes that the Property Agreement ¶ 6.2 is the type of general language that does not expressly authorize HLIG to recover damages for the subsequent Broker's Fee, closing costs, and attorney's fees and legal expenses. Moreover, the Property Agreement required HLIG to pay its own attorney's fee (Property Agreement ¶ 4.4).

## C.  Equipment

26.    The measure of damages for personalty is the difference between the purchase-price and the actual value of the article at the time and place of delivery. *See Studebaker Corp. v. Nail*, 82 Ga. App. 779, 784-785 (1950) (describing measure of damages for breach of warranty in a sale of personalty).

27.    The Court finds the Equipment was installed in the manufacturing facility at the Real Estate on the scheduled closing date, January 30, 2009. The Court also finds HLIG was to deliver the Equipment to PPI as installed in the manufacturing facility on this date.

28.    HLIG tendered Gustavo Del Rivero, a buyer-broker of used wheel manufacturing equipment. Mr. Del Rivero testified HLIG brought him in to "liquidate" the Equipment. (Deposition of Gustavo Del Rivero dated 04/02/13 ("GDR Depo.") p 25) He has no education, training or certifications for appraising and is not a member of any professional organizations in his industry (GDR Depo. pp 43-44). For his first appraisal of used wheel manufacturing equipment he testified "that was a lot of gut right there, our first one" (GDR Depo. p 87). He has only done appraisals for "internal purposes" (GDR Depo. p 88). He has never prepared an appraisal for IRS purposes or for a lending institution (GDR Depo. p 89). He is not familiar with the Uniform Standards of Professional Appraisal

Practices (USPAP) or the term "premise value" (GDR Depo. p 91). He defined "fair market value" as "run it through our business model." (GDR Depo. p 104) He "supposes" professional appraisers would "call it differently." (*Ibid*.) He has never been qualified as an expert in any state or federal court (GDR Depo. p 7).

29.    Mr. Del Rivero testified that after HLIG retained him to value the Equipment he asked to buy it. "Naturally as a salesman I asked if it becomes available may I – may I have a shot at it." (GDR Depo. p 103) He admitted his position as a potential purchaser affected his valuation of the Equipment. "[S]ure, there's got to be a difference." (GDR Depo. 104)

30.    Mr. Del Rivero also gave some self-conflicting testimony. For example, he testified that no company other than his provides auctions and liquidations of used wheel manufacturing equipment (GDR Depo. p 26), but later testified that "somebody in Germany copied our model" for doing business (GDR Depo. p 83).

31.    PPI filed a Daubert motion to disqualify Mr. Del Rivero from testifying as an expert witness.

32.    Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny, expert testimony may only be admitted into evidence if: (1) the expert is qualified to testify competently regarding the matters he intends to

address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) "the testimony assists the trier of fact through application of scientific, technical, or specialized expertise, to understand the evidence or determine a fact in issue." *Daubert*, 509 U.S. at 592; *see also Rink v. Cheminova*, 400 F.3d 1286, 1291-92 (11th Cir. 2005) (same).

33.    The Court finds and concludes that Mr. Del Rivero is not qualified to testify competently regarding the matters he intends to address. He has no education, training or certifications for appraising and is not a member of any professional organizations in his industry. He has only done appraisals for "internal purposes." He has never prepared an appraisal for IRS purposes or for a lending institution. He is not familiar with the Uniform Standards of Professional Appraisal Practices (USPAP) or the term "premise value" and does not understand how to determine an objective "fair market value."

34.    The Court also finds and concludes that the methodology by which Mr. Del Rivero reached his conclusions is not sufficiently reliable. His appraisal techniques use "a lot of gut." He is a self-interested buyer-broker of used wheel manufacturing equipment who brought his sales hat to his "valuation." "Naturally as a salesman I asked if it becomes available may I – may I have a shot at it." He

admits his position as a potential purchaser affected his valuation of the Equipment. "[S]ure, there's got to be a difference."

35.    The Court finds and concludes Mr. Del Rivero's testimony does not assist the trier of fact through application of scientific, technical, or specialized expertise, to understand the evidence or determine a fact in issue. He defined "fair market value" as "run it through our business model." The Court, as fact finder, has no way of understanding what this means or how it compares to professional appraisers, who Mr. Del Rivero acknowledges would "call it differently."

36.    HLIG did not present any evidence of the fair market value of the Equipment. The Court finds HLIG failed to meet its burden of proof of showing the amount of loss on the Equipment in a manner in which the Court could calculate with a reasonable degree of certainty.

37.    HLIG has kept the Equipment for its own use. It had possession of the Equipment on the scheduled closing date, January 30, 2009, and has maintained continuous possession of it through the present. It has installed some of the Equipment in one of its other manufacturing facilities and plans to install the rest in another of its manufacturing facilities.

38.    HLIG and its parent company believed the sale of the Real Estate and Equipment under the Property Agreement along with the sale of other assets in a

related transaction would have saved them substantial money.

39.    PPI presented the testimony of Daniel D. Zoller, Jr. Mr. Zoller is an Accredited Senior Appraiser with the American Society of Appraisers and a past President of the ASA Atlanta chapter. He holds a Master of Science degree from Central Michigan University and a Bachelor of Arts degree from Pennsylvania State University. He has over 30 years of experience in heavy construction projects and industrial valuations. He has been qualified as an appraisal expert witness in other court proceedings.

40.    The Court finds that Mr. Zoller qualifies as an expert in the fair market valuation of industrial equipment including, without limitation, the Equipment at issue.

41.    Mr. Zoller used the fair market value – installed method to value the Equipment. His testimony and accompanying report shows that the Equipment has a fair market value of $9,730,000. The Court entered this report into the record.

42.    The Court finds that the Equipment has a fair market value of $9,730,000.

### D.  Operating Expenses

43.    HLIG presented evidence that it incurred operating expenses regarding the Real Estate. Specifically, HLIG sought to recover for city and county

taxes, insurance premiums, utilities, and security and other expenses from January 30, 2009 through the June 4, 2012 sale of the Real Estate.

44.    HLIG claims that it paid city taxes of $280,777.24, county taxes of $70,029.13, and insurance premiums of $7,480.64. HLIG also claims that it paid utilities of $513,786.06 and security and other expenses of $598,513.54.

45.    HLIG did not support these claims with payment records or other admissible evidence that showed actual payment of these expenses. Moreover, HLIG's witnesses did not have experience in professional property management and could not say whether these expenses were reasonable from an objective point of view. The Court finds HLIG failed to meet its burden of proof of showing any loss for these expenses.

46.    As previously discussed, the Property Agreement states that HLIG "shall have the right to pursue any and all rights or remedies available at law or in equity, including the right to file suit for specific performance." (Property Agreement ¶ 6.2)

47.    The Court concludes that Property Agreement ¶ 6.2 is the type of general language that does not expressly authorize HLIG to recover post-breach operating expenses including these city taxes, county taxes, insurance premiums, utilities, security and other expenses. *Roba v. Dotson*, 315 Ga. App. 721 (2012).

12

48.   Moreover, HLIG did not market the Real Estate for sale until 20 months after the scheduled closing date of January 30, 2009. HLIG incurred many of these operating expenses during this period of time.

49.   PPI presented the testimony of Erika Heller. Ms. Heller is a senior vice president with Colliers Int'l – Atlanta and a member of the Institute of Real Estate Management (IREM). She holds a Bachelor of Arts degree with honors from Muhlenberg College and is a license real estate agent in the state of Georgia. She has 18 years of experience in the commercial real estate industry with a primary focus on industrial property management, including the management of 22 million square feet of industrial property.

50.   The Court finds that Ms. Heller qualifies as an expert in industrial property management.

51.   Ms. Heller's testimony and accompanying report shows that the majority of the utilities and security and other expenses were unreasonable. The Court entered this report into the record.

52.   Generally, "[w]here by a breach of contract a party is injured, he is bound to lessen the damages as far as is practicable by the use of ordinary care and diligence." *GE Capital Corp. v. Nucor Drilling*, 551 F. Supp. 2d 1375, 1380 (M.D. Ga. 2008) (quoting O.C.G.A. § 13-6-5 and citing *Central Nat. Ins. Co. v. Dixon*,

188 Ga. App. 680, 682, 373 S.E.2d 849 (1988)). In other words, as a general rule, a party injured by a breach of contract has a duty to mitigate its damages where the damages can be lessened by reasonable efforts and expense. *GE Capital*, 551 F.Supp. at 1380 (citing *Boone v. Atlanta Indep. Sch. Sys.*, 275 Ga. App. 131, 135, 619 S.E.2d 708 (2005)).

53.    Even if the law allowed for the recovery of these operating expenses, the Court finds HLIG failed to exercise ordinary care and diligence by waiting 20 months after the scheduled closing date before marketing the Real Estate for sale. These 20 months represent one-half of the 40 months between January 30, 2009 scheduled closing date and the June 4, 2012 sale.

54.    Moreover, even if the law allowed for the recovery of these expenses, the Court finds reasonable operating expenses were only $336,360.81. The Court used a two-step method to arrive at this amount. First, the Court subtracted the unreasonable portion identified in Ms. Heller's report of $797,865 from HLIG's actual operating expenses of $1,470,586.61 to arrive at $672,721.61. Second, the Court deducted one-half of this amount due to HLIG's unreasonable delay in marketing the Real Estate.

### E.  Attorney's Fees

### 1.  Property Agreement Clause

55.     The Property Agreement states: "[i]f either party defaults in its obligations hereunder, the defaulting party shall pay the reasonable attorneys' fees incurred by the other party in order to enforce its rights hereunder." (Property Agreement ¶ 7.12)

56.     Again, the Property Agreement is governed by Georgia law. (Property Agreement ¶ 7.5)

57.     O.C.G.A. § 13-1-11 limits attorney's fees provisions in notes and other evidences of indebtedness, security deeds and bills of sale to secure debt. *See* O.C.G.A. § 13-1-11(a) (notes and other evidences of indebtedness); § 13-1-11(c) (security deeds and bills of sale to secure debt).

58.     In *RadioShack Corp. v. Cascade Crossing II*, 282 Ga. 841 (2007) the Georgia Supreme Court defined 'evidence of indebtedness':

> [W]e hold that the term "evidence of indebtedness," as used in OCGA § 13-1-11, has reference to *any* printed or written instrument, signed or otherwise executed by the obligor(s), which evidences on its face a legally enforceable obligation to pay money.

*Radioshack*, 282 Ga. at 846 (emphasis added).

59.     "[T]he purpose of OCGA § 13-1-11 is to prevent a contractual provision for attorney's fees from constituting a penalty for failure to pay an indebtedness." *Id.* (citing *General Elec. Credit Corp. of Ga. v. Brooks*, 242 Ga. 109, 113 (249 SE2d 596) (1978)). "In its current form, the statute accomplishes

this purpose in subsections (a) (1) and (2) by limiting the amount of attorney's fees, and in subsection (a) (3) by giving the debtor notice and 'an opportunity to meet his obligation without incurring additional expenses in the nature of attorney['s] fees.' " *Id.* (quoting *Brooks*, *supra* at 114).

60. "The statute applies to all notes and other commercial paper without regard to the nature of the underlying transaction." *Id.* at 845-46. *See also*, *Textile Rubber*, *supra* (statute enforced for breach of a contract for sale of a thermoplastic recyclable backing system); *Level One Contact, Inc. v. BJL Enters.*, 305 Ga. App. 78, 83 (2010) (statute "limits the amount of attorney fees that can be recovered in contract cases", including leases); *Goldstein v. Ipswich Hosiery Co.*, 122 S.E.2d 339, 346-347 (Ga. App. 1961) (statute applied to action on a guaranty of a contract for payment of "items delivered" under the contract).

61. Here, the Property Agreement is an evidence of indebtedness for the purchase of the Real Estate and Equipment because it is a "printed or written instrument, signed or otherwise executed by the obligor(s), which evidences on its face a legally enforceable obligation to pay money."

62. As a prerequisite to obtaining OCGA § 13-1-11 attorney fees, the party seeking the fees must issue a demand notice (1) in writing, (2) to the party sought to be held on the obligation, (3) after maturity, (4) stating that the

provisions relative to payment of attorney fees in addition to principal and interest will be enforced, and (5) stating that the party has 10 days from the receipt of such notice to pay the principal and interest without the attorney fees. *Textile Rubber & Chem. Co. v. Thermo-Flex Techs.*, 308 Ga. App. 89, 93 (2011) (citing O.C.G.A. § 13-1-11(a)(3)); *Gen. Elec. Credit Corp. of Ga. v. Brooks*, 242 Ga. 109, 119 (1978); *Trust Assoc. v. Snead*, 253 Ga. App. 475, 476 (1) (2002)). Substantial compliance with the notice requirement is required. *Textile Rubber*, 308 Ga. App. at 93.

63.    HLIG did not present any evidence to show it sent a demand notice to PPI. The Court finds that HLIG failed to issue the necessary statutory demand. Therefore, HLIG may not recover attorney's fee under the Property Agreement.

### 2.  Bad Faith Statute

64.    "The expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them." O.C.G.A. § 13-6-11.

65.    The Court finds that PPI did not act in bad faith, was not stubbornly litigious and did not cause unnecessary trouble or expense.

### 3.  Lodestar Method

66.     In *Teare v. Remax of Ga.*, 2008 U.S. Dist. LEXIS 104354 (N.D. Ga.),
the court described the lodestar method:

> "The most useful starting point for determining the amount of a
> reasonable fee is the number of hours reasonably expended on the
> litigation multiplied by a reasonable hourly rate. The product of this
> formula is the 'lodestar,' which is the guiding light of our fee-shifting
> jurisprudence." Kenny A. v. Perdue, 532 F.3d 1209, 1219 (11th Cir.
> 2008) (internal citations and quotations omitted).

*Teare*, 2008 U.S. Dist. LEXIS 104354 *3. "[T]he fee applicant bears the burden of

establishing entitlement to an award and documenting the appropriate hours

expended and hourly rate." *Id*. (citing *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103

S. Ct. 1933, 76 L. Ed. 2d 40 (1983)).

67.     A reasonable hourly rate is determined by "the prevailing market rate

in the relevant legal community for similar services by lawyers of reasonably

comparable skills, experience, and reputation." *Kinnard v. Kelly*, 2010 U.S. Dist.

LEXIS 18677, *15 (N.D. Ga.) (quoting *Norman v. Hous. Auth. of City of

Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988)). "Satisfactory evidence at a

minimum is more than the affidavit of the attorney performing the work." *Kinnard*,

2010 U.S. Dist. LEXIS at * 15 (quoting *Norman*).

68.     "The relevant legal community is the area in which the court sits . . . ."

*Id*. (quoting *Knight v. State of Alabama*, 824 F. Supp. 1022, 1028 n. 1 (N.D. Ala.

1993) (citing *Turner v. Secretary of Air Force*, 944 F.2d 804, 808 (11th Cir.

1991))).

69.    A district court should exclude from the fee calculation hours that

were not reasonably expended:

> Cases may be over staffed, and the skill and experience of lawyers
> vary widely. Counsel for the prevailing party should make a good
> faith effort to exclude from a fee request hours that are ***excessive,
> redundant, or otherwise unnecessary***, just as a lawyer in private
> practice ethically is obligated to exclude such hours from his fee
> submission. In the private sector, billing judgment is an important
> component in fee setting. It is no less important here. Hours that are
> not properly billed to one's client also are not properly billed to one's
> adversary pursuant to statutory authority.

*Id*. at **5-6 (citing *Hensley*, 461 U.S. 424 at 434). (Emphasis added.)

70.    In determining a reasonable number of compensable hours, the court

should consider the 12 factors from *Johnson v. Georgia Highway Express*, 488

F.2d 714, 717-719 & fn 11 (5th Cir. 1974): (1) the time and labor required; (2) the

novelty and difficulty of the questions; (3) the skill requisite to perform the legal

service properly; (4) the preclusion of employment by the attorney due to

acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or

contingent; (7) time limitations imposed by the client or the circumstances; (8) the

amount involved and the results obtained; (9) the experience, reputation, and

ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and

length of the professional relationship with the client; and (12) awards in similar cases. *Kinnard*, 2010 U.S. Dist. LEXIS at **17-18.

71.     "[T]he degree of the Plaintiff's success in relation to the other goals of the lawsuit is a factor critical to the determination of the size of a reasonable fee." *Id*. at *4 (*Texas State Teachers Ass'n v. Garland Independent School Dist.*, 489 U.S. 782, 790, 109 S. Ct. 1486, 103 L. Ed. 2d 866 (1989)).

> If . . . a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith. Congress has not authorized an award of fees whenever it was reasonable for a plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill. Again, *the most critical factor is the degree of success obtained*.

*Id*. at ** 6-7 (citing *Hensley*, 461 U.S. at 434, 436) (emphasis added).

72.     HLIG presented evidence that it incurred attorney's fees and legal expenses in this litigation of $939,788.02, including interest. HLIG did not identify which attorney's fees involved only its claim for breach of contract.

73.     HLIG presented the testimony of Michael D. Crisp, an attorney with the New York office of Robinson Cole LLP. Mr. Crisp opined that HLIG should not have included a request for interest for dates falling before the Court's October

12, 2012 Summary Judgment Order. He also opined that HLIG's documentation of the costs claimed needed to be supplemented.

74.    PPI presented the testimony of William J. Holley, II. Mr. Holley is a partner with the law firm Parker, Hudson, Rainer & Dobbs, LLP in Atlanta, Georgia. He holds a law degree from Vanderbilt University School of Law and an undergraduate degree from Duke University. He has practiced civil litigation for more than 23 years.

75.    Mr. Holley's testimony and accompanying report shows that a reasonable attorney fee for this case should not exceed $419,690. Further, Mr. Holley encourages the Court to reduce this figure using criteria familiar to the application of the lodestar method used in the Northern District of Georgia including, without limitation, HLIG's relative success or failure on its claims. He also points out that allocating attorney's fees and costs between the breach of contract claim and PPI's counterclaims would further reduce this amount. He also identified HLIG's inadequate documentation of its costs claim. The Court entered Mr. Holley's report into the record.

76.    The Court finds that Messrs. Holley and Crisp qualify as experts in the reasonableness of attorney fee requests and legal costs in the Northern District of Georgia.

77.     The Court finds that HLIG failed to document its costs claim in the amount of $47,760.88.

78.     The Court adopts Mr. Holley's opinion on reasonableness. It is clear to this Court that HLIG over-litigated this case.

79.     The Property Agreement's attorney's fee provision limits the award of reasonable attorney's fees to the non-defaulting party to those incurred to enforce rights under the Property Agreement. *See* Property Agreement ¶ 7.12 ("the defaulting party shall pay the reasonable attorneys' fees incurred by the other party *in order to enforce its rights hereunder*") (emphasis added).

80.     Based on the Court's familiarity with this litigation since its inception including, without limitation, the relative efforts of the parties to contest the claims and counterclaims, the Court finds that 10% of the reasonable attorney's fees are attributable to HLIG's claim to enforce its rights under the Property Agreement and 90% are attributable to PPI's counterclaims, which involved a dispute that the Court has ruled did not affect HLIG's rights under the Property Agreement. Therefore, HLIG's claim for attorney's fees is no more than $41,969.

81.     On the *Johnson* factors, the Court finds: (1) the time and labor required on HLIG's claim were equivalent to a common breach of contract collection case; (2) the questions were not novel or difficult; (3) the skill requisite

to perform the legal service properly was that of a typical commercial litigation lawyer with seven years' post-graduate experience; (4) the preclusion of employment by the attorney due to acceptance of the case was not shown; (5) the customary fee is 10% of the recovery plus $25, *see* O.C.G.A. § 13-1-11(a)(2) (where the debt is in excess of $500, but the provision does not state a specific percent, the attorney's fees are capped at ten percent (10%) plus $25); (6) the fee is contingent, not fixed; (7) no time limitations were imposed by the client or the circumstances; (8) the amount involved was zero and the results obtained was zero; (9) the experience, reputation, and ability of the attorneys was satisfactory; (10) the case was not "undesirable"; (11) the nature and length of the professional relationship with the client was not shown; and (12) awards in similar cases also would be zero because similar contracts typically allow non-breaching sellers to retain the property and also involve earnest money amounts less than the deposit in this case.

**F.  Interest**

84.    The statutory interest rate in effect is six and one quarter percent (6.25%). *Smith v. American Int'l Life Assurance Co. of New York*, 50 F.3d 956 (11th Cir. 1995) (applying the prime rate plus three percent formula of O.C.G.A. § 7-4-12); (http://www.federalreserve.gov/releases/ h15/data.htm (showing prime

rate during the period January 2009 to the present as three and one quarter percent).

85.     "In all cases where an amount ascertained would be the damages *at the time of the breach*, it may be increased by the addition of legal interest from that time until the recovery." O.C.G.A. § 13-6-13 (Emphasis added.) The Court finds that the damages at the time of the breach were zero and concludes that no interest is awarded.

## CONCLUSIONS OF LAW

86.     The Property Agreement called for PPI to pay $5,150,000 to HLIG in exchange for HLIG transferring to PPI the Real Estate and the Equipment.

87.     The parties did not close on the Property Agreement at the scheduled closing on January 30, 2009. As a result HLIG received a $1,000,000 deposit and retained ownership and possession of Real Estate worth $1,850,000 and of Equipment worth $9,730,000.

88.     HLIG suffered no damages because the Real Estate and Equipment that it retained plus the deposit exceeded the purchase price in the Property Agreement.

89.     Even if the Property Agreement allowed for the recovery of operating expenses, this would not change the result. HLIG received funds and retained

assets of $12,630,000 against a lost purchase price plus reasonable operating expenses plus interest of $5,532,334.81. Therefore, HLIG still would have shown no damages. Moreover, even the addition of the net of the costs (the Broker's Fee, closing costs and transactional attorney's fees) and offsets (the propane tank and the July 2011 forfeited earnest money) from the eventual sale of the Real Estate does not change the result. The Court is persuaded that whatever business reasons may have motivated HLIG to enter into the Property Agreement on its terms, the assets it held after the scheduled closing had a fair market value well above any measure of damages advanced by HLIG. HLIG's decision to retain and use the Equipment supports this conclusion.

90.    The Court denies HLIG's request for attorney's fees. HLIG is not entitled to attorney's fees under the Property Agreement because it did not satisfy the notice requirements of OCGA § 13-1-11. It is not entitled to attorney's fees under OCGA 13-6-11 because PPI did not act in bad faith or otherwise as required by this statute.

91.    Moreover, contractual "prevailing party" attorney's fees are not recoverable in the absence of an award of some relief sought. *Magnetic Resonance Plus v. Imaging Sys. Int'l*, 273 Ga. 525 (2001). This also applies to the Georgia bad faith statute, O.C.G.A. § 13-6-11. "An award of attorney fees but no other damages

or affirmative relief under a statute that authorizes an award of attorney fees to the "prevailing party" is illegal and void." *Benchmark Builders v. Schultz*, 289 Ga. 329, 330 (2011) The Court awards no damages or equitable relief. Therefore, attorney's fees are not awarded.

92.    Also, the degree of success is nonexistent. HLIG simply did not need file this case to prove PPI's breach of a Property Agreement for which HLIG received $1,000,000 and held onto or sold assets worth much more than any reasonable measure of losses that it could have advanced in this case. Therefore, the Court awards no attorney's fees.

93.    In addition, under either a "prevailing party" contract theory or a bad faith statute theory, HLIG's claim is limited to work performed on the main action, i.e., its claim for breach of contract. The Property Agreement allows the prevailing party to recover reasonable attorneys' fees "incurred…to enforce its rights hereunder." The Court has ruled PPI's counterclaims did not "relate directly to the Property Agreement." (Order p 3) Therefore, attorney's fees incurred to address the counterclaim issue were not incurred to enforce its rights on the breach of contract claim.

Under O.C.G.A. § 13-6-11 "a defendant cannot recover in a given lawsuit the expenses of defending that suit." *Glenn v. Fourteen West Realty*, 169 Ga. App.

549, 551 (1984) (quoting *Ballenger Corp. v. Dresco Contractors*, 156 Ga. App. 425, 432 (274 SE2d 786) (1980)). The rule applies to a counterclaim defendant. *Lineberger v. Williams*, 195 Ga. App. 186, 188-189 (1990)

In *Lineberger* the plaintiff's evidence showed only the amount of reasonable attorney's fees that would be attributable to both his prosecution of the main action and his defense of defendant's counterclaim. There was no evidence showing the amount of reasonable attorney's fees that would be attributable to only the prosecution of the main action. The jury returned a verdict for the plaintiff. The trial court denied defendant's motion for a directed verdict on plaintiff's claim for attorney's fees. On appeal, the court reversed. The court held the defendant was entitled to a directed verdict on the issue of attorney's fees because plaintiff failed to isolate and prove the reasonable attorney's fees "involved in pursuit of his main action." *Lineberger*, 195 Ga. App. at 189 (citation and internal markings omitted)

The Court finds HLIG failed to isolate and prove the reasonable attorney's fees involved in pursuit of its main action as opposed to attorney's fees involved both in the pursuit of its claims and in defense of the counterclaims. Therefore, the Court concludes HLIG failed to carry its burden of proof and awards no attorney's fees.

Respectfully submitted this 17th day of May, 2013.

**KOENIG LAW GROUP, P.C.**

<u>s/ George A. Koenig</u>
GEORGE A. KOENIG
Georgia Bar No. 427626
Attorney for Punch Property Int'l NV

Peachtree 25th, Suite 599
1718 Peachtree Street, N.W.
Atlanta, Georgia 30309
Phone: 678-539-6171
Fax: 678-539-6218

## CERTIFICATE OF SERVICE

This is to certify that the undersigned electronically files the within and foregoing **Defendant's Proposed Findings of Fact and Conclusions of Law** with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to the following attorneys of record:

David Paul Thatcher
Ogletree Deakins Nash Smoak &
Stewart, P.C.-Atl
191 Peachtree Street, N.E.
Suite 4800
Atlanta, GA 30303
david.thatcher@ogletreedeakins.com

This 17th day of May, 2013.

KOENIG LAW GROUP, P.C.

s/ George A. Koenig
GEORGE A. KOENIG
Georgia Bar No. 427626
Attorney for Punch Property Int'l NV
Peachtree 25th, Suite 599
1718 Peachtree Street, N.W.
Atlanta, Georgia 30309
Phone: 678-539-6171
Fax: 678-539-6218